

# THE ATTORNEY GENERAL
# OF TEXAS

### AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**          November 30, 1960

Hon. Penn J. Jackson, Chairman          Opinion No. WW-968
State Board of Insurance
International Life Building          Re: Duty of the Board in cal-
Austin 14, Texas                             culating specific premium
                                             rate for individual fire risks
                                             and related questions.

Dear Mr. Jackson:

      You have asked our opinion concerning several questions pertaining to the Board's duties and responsibility with respect to fixing rates for specific risks under the provisions of Subchapter C of Chapter 5 of the Insurance Code. This subchapter charges the Board with the duty of prescribing, fixing, determining and promulgating the rates of premium to be charged and collected by fire insurance companies transacting business in this State. In the past the Board has maintained two distinct approaches to this field. Overall, the Board has promulgated certain rules by which to determine the final rate of premium for a specific risk. These rules are set forth in the Texas General Basis Schedules referred to as the GBS. On certain classes of risks the Board "publishes" the rate for specific individual risks. These "published" rates are developed by direct inspection or by analysis of factual information supplied by insurance agents or other persons with the inspection and analysis being done by the Board-employed personnel. On the other hand, many classes of risks receive no "published" rate, the Board simply promulgating the rules by which such a rate can be calculated and placing the responsibility upon the insurance company to properly calculate the rate of premium from such rules. The largest class in the unpublished category is the dwelling class while published rates are, in the main, applicable to commercial and mercantile risks. You have estimated that about 70% of the premium volume in this State is produced on risks for which there is no "published" rate. You have stated that this departmental practice is well-established, probably dating back to the enactment of the original fire insurance rating law in 1909. You have stated that some changes are contemplated in connection with this practice and that the

questions asked are for the purpose of determining the Board's legal responsibilities in this matter. Your first two questions are:

"(1) Is the Board legally required to calculate the specific premium rate for each individual fire risk within the State, even though it has already promulgated the rules from which the calculation may be made?

"(2) If your answer to the above question is in the negative, please advise whether the Board may, in its discretion, make such calculations."

The foundation of the Board's authority in the field of fire insurance rating is found in Article 5.25 and Article 5.26 of the Insurance Code. Article 5.25 provides in part:

"The Board of Insurance Commissioners shall have the sole and exclusive power and authority and it shall be its duty to prescribe, fix, determine and promulgate the rates of premiums to be charged and collected by fire insurance companies transacting business in this State. Said Board shall also have authority to alter or amend any and all such rates of premiums so fixed and determined and adopted by it, and to raise or lower the same, or any part thereof, as herein provided. Said Board shall have authority to employ clerical help, inspectors, experts and other assistants, and to incur such other expenses as may be necessary in carrying out the provisions of this law . . ."

Article 5.26(a) provides in part:

". . . collected by all companies transacting in this state the business of fire insurance, as herein defined, shall be exclusively fixed and determined and promulgated by the Board, and no such fire insurance company shall charge or collect any premium or other compensation for or on account of any policy or contract of fire insurance as herein defined in excess of the maximum rate as herein provided for;. . ."

The Board and its predecessors have always considered that the authority to fix the rate of premium for a specific risk emanated from the last sentence of Article 5.29 which reads as follows:

"The Board, and any inspector or other agent or employee thereof, who shall inspect any risk for the purpose of enabling the Board to fix and determine the reasonable rate to be charged thereon, shall furnish to the owner of such risk at the date of such inspection a copy of the inspection report, showing all defects that may operate as charges to increase the insurance rate."

In our opinion this language is specific legislative recognition that the Board has the power and authority to calculate the rate for an individual risk by the procedure above outlined. Consideration of the legislative history of the fire insurance rating law leaves no doubt as to the existence of this authority. Even should we assume the language of this chapter of the Code to be ambiguous, nevertheless, the longstanding departmental practice along with apparent longstanding legislative acquiescense would require adherence to the administrative interpretation. In this connection, legislative acquiescense in this interpretation is found in the fact that annual appropriations of sizable amount have been made for many, many years for the purpose of providing the personnel and equipment necessary to perform this function of rating and publishing the rates for individual risks. For example, the last session of the Legislature appropriated in excess of $250,000 for this purpose for the year ending August 31, 1960, and a like amount for the year ending August 31, 1961.

The statutes are somewhat obscure whether the Board must fix and "publish" specific rates for all fire insurance risks in the State. Even less certain is the line of division, if there be any, between the category of risks for which a specific rate is to be calculated and those for which a specific rate need not be calculated. Some insight may be gained by resort to the legislative history of the law now on the books. The present Subchapter C of Chapter 5 of the Texas Insurance Code stems almost entirely from Chapter 106, Acts 1913, p. 195, which created the State Fire Insurance Commission. Most of the language of that Act is present in its original verbiage in the present Insurance Code. In the brief period from 1909 to 1913 our insurance rate regulation was the subject of repeated legislative attention.

The initial attempt at state regulation of fire insurance rates culminated in the passage of the Fire Insurance Rating Board Act, Acts 1909, 31st Leg., 1st C.S., p. 311, Ch. 18. This Act created the Fire Insurance Rating Board and required insurance companies to file their schedules and rates with such Board for approval. The Board was authorized to reject the rates filed if either excessive or inadequate. The Board was also given the authority to publish "specific schedules of fire insurance rates which shall by said Board be deemed reasonable," but these schedules were but recommendations. The primary purpose of the measure was to prevent discrimination in rates as between insureds. (See for example the caption of this Act.) It is further clear that the two remaining enactments, the 1910 Act and the 1913 Act, were for this same purpose and that each represented an attempt to provide a better method for preventing such discrimination.

Apparently widespread dissatisfaction arose from the enforcement of the fire rating law leading to cries for repeal of the 1909 Act and a replacement with more stringent controls.*

As a result, the Legislature enacted the State Insurance Board Act which created the State Insurance Board and wiped out the former Fire Insurance Rating Board by the repeal of the 1909 Act. Acts 1910, 31st Leg., 4th C.S., Ch. 8, p.125. The basic change from the 1909 Act was that the State Insurance Board was given the "power, authority,. . . duty to prescribe, fix, control and regulate rates of fire insurance" by making and prescribing "general basis schedules, together with rules and regulations for determining maximum specific rates therefrom," Sec. 4, 1910 Act. Again Section 11 of the Act provided:

> ". . . said Board is empowered and it is. . . its
> duty, to prepare a system of general basis schedules,
> together with rules for applying the same, for deter-
> mining fire insurance rates on property in this state,
> the said general basis schedules and the rules for
> applying the same to be at all times reasonable;. . ."

---

*See Proclamation June 15, 1910, of Governor T. M. Campbell convening Third C.S. of 31st Leg. (p. 1-General & Special Laws of Texas Third and Fourth C.S. - 31st Leg. 1910) and Message of the Governor dated July 19, 1910, to the Third C.S. of 31st Leg. (p. 4 - Id.); Proclamation of Governor T. M. Campbell convening Fourth C.S. of 31st Leg. dated Aug. 17, 1910 (p. 111 - Id.)

Section 12 of the Act provided that after the adoption of the General Basis Schedule and the rules and regulations for applying them each insurance company should within a reasonable time file with the Board:

> ". . .its application of said general basis schedules to the specific risks of the State and the specific rates obtained thereby in accordance with the several provisions of this Act; and provided further, that any one or more insurance companies may employ for the application of such general basis schedules and the making of such specific rates, the service of such experts as they may deem advisable for such purpose, but the contract or contracts of employment of such experts shall first be submitted to the State Insurance Board for its approval; provided, further, that the State Insurance Board shall have authority, and it shall be the duty of said board, personally or by its agents, to inspect and supervise the work of said experts in the application of said general basis schedules in the determination of specific rates, which rates shall be the maximum insurance rates that may be charged for insurance in this state. . . And it shall be the duty of the expert or experts representing the insurance companies, or any insurance company in this state, to furnish at the date of inspection to the owners of all risks inspecting for the purpose of applying the general basis schedule provided for in this Act, a copy of such inspection report showing all defects that operate as charges to increase the insurance rate.

> "It is further provided that the maximum specific rates so made by a company or companies. . .shall not take effect. . .until such maximum specific rates have been approved by the board. The board shall have the authority to reject said maximum specific rates so made, or any part thereof, or to alter, amend, modify, or change the same,. . . .; provided, however, that the said board shall have authority in its discretion to permit the said company or companies to apply the said schedules of basis rates to risks other than mercantile and special hazards without having first submitted the

> maximum specific rates so made to said board
> for approval. But such rates that the board may
> permit any company or companies to apply without
> the board's approval shall always be subject to
> review by the board, and, by the proper showing
> of any policyholder or policyholders, may be re-
> duced. . ."

Under this law the State Insurance Board promulgated the first State-authored General Basis Schedules. The general overall pattern of this first General Basis Schedules prevails in the General Basis Schedules presently in use.

Evidently this system did not prove satisfactory and in 1913 the State Fire Insurance Commission Act was passed, creating the State Fire Insurance Commission, doing away with the State Fire Insurance Board, and repealing the 1910 Act.

We think it is clearly evident from a comparison of the corres ponding sections of the 1913 Act to the 1910 Act that the primary purpose of enacting the 1913 Act was to increase the duty and responsibility of the regulatory authorities to the end that rules and schedules promul-gated by the Board would be properly applied in calculating specific rates. It is further evident that the primary method by which this goal was to be realized was by transferring the duty of fixing the specific rates from the companies to the Board. As previously related, Section 4 of the 1910 Act placed upon the State Fire Insurance Board the duty to "prescribe, fix, control and regulate rates of fire insurance," and to "prescribe general basis schedules, together with the rules for deter-mining maximum specific rates." The companies were required to make the application of the rules and submit the specific rates to the Board for approval. Sec. 12, 1910 Act. Section 6 of the 1913 Act (Art. 5.25), in contrast, provided in part as follows:

> "The State Fire Insurance Commission shall have
> the sole and exclusive power and authority, and it shall
> be its duty to prescribe, fix, determine and promulgate
> the rates of premiums to be charged and collected by
> fire insurance companies transacting business in this
> State. As soon as practicable after this Act shall take
> effect, the State Fire Insurance Commission shall begin
> the work of fixing and determining and promulgating the

> rates of premiums to be charged and collected by fire
> insurance companies throughout the State, and the making
> and adoption of its schedules of such rates. . ."

A key comparison may be made between Section 12 of the 1910
Act and Section 13 of the 1913 Act. Section 12 of the 1910 Act required
the companies to apply the GBS and the Board to pass upon those specific
rate applications. Section 13 of the 1913 Act (Art. 5.29) commences:

> "The rates of premiums fixed by said Commission
> under and in pursuance of the provision of this Act shall
> be at all times reasonable and the schedules thereof
> made and promulgated by said Commission as herein
> provided, shall be in such form as will in the judgment
> of the Commission, most clearly and definitely and in
> detail disclose the rate so fixed and determined by said
> Commission to be charged and collected for policies
> of fire insurance."

Under the provisions of Section 12 of the 1910 Act it was
made the duty of the experts of the insurance company to furnish to the
owners of all risks inspected for the purpose of applying the GBS, at
the date of inspection, a copy of the inspection report showing all
defects that operated as charges to increase the insurance rate. The
corresponding provision of the 1913 Act (Sec. 13) (Art. 5.29) provided:

> "It shall be the duty of the State Fire Insurance
> Commission, and of any inspector or other agent or
> employe thereof, who shall inspect any risk for the
> purpose of enabling the Commission to fix and determine
> the reasonable rate to be charged thereon, to furnish
> to the owner of such risk at the date of such inspection,
> a copy of the inspection report, showing all defects that
> may operate as charges to increase the insurance rate."

We think, then, beyond question, that the Legislature by the
1913 Act intended to vest the then State Fire Insurance Commission with
the power to fix specific rates on specific risks, i.e., to apply the Gener-
al Basis Schedules.

Under the 1910 Act, the State Insurance Board was given the
authority:

". . .in its discretion to permit the . . .companies
to apply the . . .schedules of basis rates to risks other
than mercantile and special hazards without having
first submitted the maximum specific rates so made to
said board for approval.  But such rates. . .always be
subject to review by the Board." Sec. 12, 1910 Act.

It was under this authority that the then State Insurance Board promul-
gated, in the then GBS, rules which specified certain risks and classes
of risks for which the specific rates need not be approved in advance by
the Board.  Rule 335, GBS, 1911.

The corresponding provision in the 1913 Act, Sec. 13,
provided:

". . .and said Commission shall also have full power
and authority to prescribe reasonable rules whereby in
cases where no rate of premium shall have been fixed
and determined by the Commission, for certain risks
or classes of risks, policies may be written thereon
at rates to be determined by the company, provided,
however, that such company or companies shall imme-
diately report to said Commission said risks so written,
and the rates collected therefor, and such rates shall
always be subject to review by the Commission."

After the passage of the 1913 Act, the 1915 GBS, published
by the new State Fire Insurance Commission, contained a rule corres-
ponding to Rule 335, GBS, 1911, which provided in part:

"Application must be made for all ratings and such
ratings do not take effect until promulgated, except
as specified below.

"Companies, their special and local agents, are
permitted to rate, and such rates are not required to
be promulgated, the following classes when not exposed,
or when exposed solely by Special Classes, as shown
on pages 65 to 69, both inclusive:" (classes mentioned)

This system of exclusion of certain specified classes has been maintained from that date to the present.

Therefore, it is our opinion, in answer to your first two inquiries, that the Legislature intended to place upon the Board the primary responsibility of calculating the specific rate for individual risks. At the same time, the Legislature has provided that there may be certain exceptions where the Board may allow the companies to make the actual calculation under rules promulgated by the Board. The discretion in selection is left with the Board but we do not believe that in the exercise of that discretion the Board can properly abdicate its specific rate application function in its entirety or exercise such function in a token manner.

Before responding to the third and fourth questions, some additional facts must be set forth. Rate books, showing "published" rates for each city and town in Texas are now being printed and distributed by the State Board of Insurance. These books are distributed free to licensed companies upon request. Recording agents are furnished free copies of the rate book for the towns or cities in which they reside. As new "published" rates are developed, supplements to the rate books are printed, and distributed on the same basis as the original books. This free distribution is made weekly, thus enabling a current list of published rates on the risks within a city or town. Your third and fourth questions are as follows:

> "(3) If the Board does make such calculations, either to satisfy legal requirements or by way of exercising a discretionary power, does the Board then have a legal obligation to make the specific rates available to insurance companies and agents?

> "(4) If the Board must furnish these specific rates to insurance companies and their agents, what fees or costs, if any, must the Board collect?"

The only provision of the Insurance Code directly pertinent to these questions is the language of Article 5.29 which reads in part as follows:

"The said Board in making and publishing
schedules of the rates fixed and determined by
it shall show all charges, credits, terms, priv-
ileges and conditions which in anywise affect such
rates, and copies of all such schedules shall be
furnished by said Board to any and all companies
affected by this subchapter applying therefor, and
the same shall be furnished to any citizens of this
State applying therefor, upon the payment of the
actual cost thereof. . ."

In view of the legislative history of the fire rating laws and
in particular the changes made in this Section from the 1910 Act (Sec.
11) to the 1913 Act (Sec. 13), there is no doubt in our minds that this
language covers the specific or "published" rates.

However, we are faced with some uncertainty regarding the
extent of the authority of the Board to make a charge for the furnishing of
this material. Article 5.29 requires the Board to furnish the material
on application either by a company affected by the fire rating law or by
any citizen of the State. Gramatically speaking, the phrase "upon the
payment of the actual cost thereof" could either modify both of the pre-
vious clauses or only the clause relating to citizens of this State.
Because of the previous legislative history of this section we are inclined
to the view that the Board is required to furnish this material free of
charge to companies mentioned but is empowered to collect the cost of
the material when furnished to others. Section 11 of the 1910 Act
provided:

". . .provided, that such schedules and the rules
for applying the same shall be furnished by said board
to any and all insurance companies affected by this Act
applying therefor; and the same shall be furnished to
any citizen of this state applying therefor upon the pay-
ment of the actual cost thereof."

It is, of course, true that the meaning of legislative enactments
are not strictly controlled by the form of punctuation used by the Legis-
lature. However, it appears to us that the Legislature would not have
referred to insurance companies and citizens of the State separately unless
a distinction were intended. This difference in treatment is understandabl

as insurance companies since the 1910 Act have been assessed the cost of the administrating of the fire insurance rating laws. (See Art. 5.49) There is no specific mention in Article 5.29 of the agents of insurance companies and it is our opinion that the Board is only required to furnish the material in question to the agents on the same basis as to other citizens of the State.

## SUMMARY

While the Board is legally authorized and it is its duty to calculate the specific premium rate for individual fire risks within the State, it is within its discretion to determine whether it shall do so with respect to any particular class of risk. However, in the exercise of that discretion the Board cannot abdicate its specific rate application in its entirety or exercise such function in a token manner. The Board, upon application, must furnish, free of cost, copies of the specific rates so fixed to companies subject to the fire insurance rating laws but is required to do so on application of agents who are citizens of this State only upon the payment of the actual cost.

Respectfully submitted,

WILL WILSON
Attorney General of Texas

By _Fred B. Werkenthin_
Fred B. Werkenthin
Assistant Attorney General

FBW:lmc

APPROVED:

OPINION COMMITTEE:

W. V. Geppert, Chairman
Ray Loftin
Ben Harrison
Iola Wilcox
Jack Goodman

REVIEWED FOR THE ATTORNEY GENERAL
BY: Leonard Passmore